**PUBLIC VERSION**

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
WACO DIVISION**

| | |
|---|---|
| SUNSTONE INFORMATION DEFENSE, INC., | |
| Plaintiff, | CIVIL ACTION NO. 6:20-cv-01033-ADA |
| v. | |
| INTERNATIONAL BUSINESS MACHINES CORPORATION | **JURY TRIAL DEMANDED** |
| | **FILED UNDER SEAL** |
| Defendant. | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO DEFENDANT'S MOTION TO
EXCLUDE EXPERT OPINIONS OF ERIC COLE, PH.D. AND RYAN LAMOTTA**

**PUBLIC VERSION**

## TABLE OF CONTENTS

I.     INTRODUCTION ..................................................................................................1

II.    LEGAL STANDARD ............................................................................................3

III.   ARGUMENT .......................................................................................................4

    A.   Dr. Cole's Apportionment Methodology Is Properly Based On The Totality Of The Evidence .....................................................................................4

    B.   Mr. LaMotta Properly Disclosed And Explained The Bases For His Profit Split Opinion ..........................................................................................8

        1.   The Law Does Not Require What IBM Demands .......................................8

        2.   Mr. LaMotta Performed Express Quantitative And Qualitative Analyses To Reach His Profit Split Opinions, And Those Opinions Are Tied To The Facts Of The Case .....................................................................11

    C.   IBM's Complaints Regarding The ▮▮▮▮ ▮▮▮▮▮ Go To The Weight, Not The Admissibility, Of Mr. LaMotta's Opinions ...........................................18

    D.   IBM's Criticisms Of Mr. LaMotta's Reliance On Separate Litigation Go To Their Weight, Not Admissibility ..................................................................20

        1.   The Cisco Verdict ..................................................................................20

        2.   The F5 Litigation ..................................................................................22

IV.   CONCLUSION ..................................................................................................23

PUBLIC VERSION

## <u>INDEX OF AUTHORITIES</u>

**Cases**

*Barry v. Medtronic, Inc.*,
  No. 14-cv-104, 2016 WL 7665423 (E.D. Tex. July 19, 2016) ..................................... 9, 11

*Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*,
  No. 15-152-RGA, 2018 WL 5729732 (D. Del. Nov. 2, 2018) ......................................... 10

*Comcast IP Holdings I, LLC v. Sprint Commn'cs*,
  No. 12-cv-0205, 2015 WL 4730899 (D. Del. Aug. 10, 2015) ........................................ 10

*Cook Inc. v. Endologic, Inc.*,
  No. 1:09-cv-01248, 2012 WL 3948614 (S.D. Ind. Sept. 10, 2012) ................................ 21

*Daubert v. Merrell Dow Pharm., Inc.*,
  509 U.S. 579 (1993) ................................................................................................... 3, 4

*GPNE Corp v. Apple, Inc.*,
  2014 WL 1494247 (N.D. Cal. Apr. 16, 2014) ................................................................ 16

*Internet Machines LLC v. Alienware Corp.*,
  No. 6:10-cv-23, 2013 WL 4056282 (E.D. Tex. June 19, 2013) ..................................... 22

*LaserDynamics, Inc. v. Quanta Computer, Inc.*,
  694 F.3d 51 (Fed. Cir. 2012) ......................................................................................... 9

*Lawrence v. Raymond Corp.*,
  2011 WL 3418324 (N.D. Ohio Aug. 4, 2011) ................................................................ 16

*Lucent Techs., Inc. v. Gateway, Inc.*,
  580 F.3d 1301 (Fed. Cir. 2009) ...................................................................................... 9

*Odyssey Wireless, Inc. v. Apple Inc.*,
  2016 WL 7644790 (S.D, Cal. Sept. 14, 2016) .............................................................. 16

*PerdiemCo, LLC v. Industrack LLC*,
  No. 2:15-cv-727, 2016 WL 6611488 (E.D. Tex. Nov. 9, 2016) ................................. 9, 10

*Plastic Omnium Advanced Innovation and Research v. Donghee Am., Inc.*,
  387 F. Supp. 3d 404 (D. Del. 2018) ......................................................................... 10, 17

*Puga v. RCX Solutions, Inc.*,
  922 F.3d 285 (5th Cir. 2019) .................................................................................. passim

**PUBLIC VERSION**

*Radio Sys. Corp. v. Lalor*,
    No. C10-828RSL, 2014 WL 4626298 (W.D. Wash. Sept. 12, 2014) ............................ 10

*Realtime Data LLC v. EchoStar Corp.*,
    No. 17-cv-00084, 2018 WL 6266301 (E.D. Tex. Nov. 15, 2018) ..................................... 9

*Sprint Commc'ns Co, L.P. v. Time Warner*,
    760 F. App'x 977 (Fed. Cir. 2019) ................................................................................. 21

*Sprint Commc'ns Co.. L.P. v. Comcast Cable*,
    225 F. Supp. 3d 1233 (D. Kan. 2016) ............................................................................ 21

*Summit 6, LLC v. Samsung Elecs. Co.*,
    802 F.3d 1283 (Fed. Cir. 2015) ....................................................................................... 9

*Traxcell Techs., LLC v. AT&T Corp.*,
    No. 2:17-CV-00718, 2019 WL 4470618 (E.D. Tex. Sept. 18, 2019) ............................... 7

*Traxcell Techs., LLC v. Sprint Commc'ns Co. LP*,
    15 F.4th 1121 (Fed. Cir. 2021) ....................................................................................... 7

*Tubular Rollers, LLC v. Maximums Oilfield Prods., LLC*,
    No. 4:19-cv-03113, 2021 WL 5991744 (S.D. Tex. Dec. 16, 2021) ............................... 17

*Uniloc USA, Inc. v. Microsoft Corp.*,
    632 F.3d 1292 (Fed. Cir. 2011) ..................................................................................... 16

*United States v. Hicks*,
    389 F.3d 514 (5th Cir. 2004) ........................................................................................... 3

*Virnetx, Inc. v. Cisco Sys. Inc.*,
    767 F.3d 1308 (Fed. Cir. 2014) ..................................................................................... 16

**Rules**

FED. R. CIV. P. 11 ..................................................................................................................... 22

Federal Rule of Evidence 702 ................................................................................... 3, 4, 10, 24

**PUBLIC VERSION**

## I.   INTRODUCTION

Defendant International Business Machines Corporation ("IBM") first seeks to exclude two paragraphs relating to technical apportionment from Dr. Eric Cole's technical expert report.[1] IBM claims that those paragraphs out of Dr. Cole's expert report, which totals 2674 paragraphs over 975 pages, are "arbitrary" and "plucked out of thin air."  However, the record shows Dr. Cole provided extensive support for his technical apportionment opinions. Similar to the analysis done by IBM's expert, Dr. Cole's apportionment was based on his experience, a review of the source code, IBM's technical documentation, and testimony of IBM's corporate witnesses. Utilizing this evidence, Dr. Cole properly analyzed the technical benefits of the accused technology in view of the Asserted Patents.  IBM's criticisms of Dr. Cole are more properly flushed out through vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof.

IBM also seeks to exclude certain opinions of Plaintiff SunStone Information Defense, Inc.'s ("SunStone") damages expert, Ryan LaMotta.[2]  Notably, IBM does not challenge Mr. LaMotta's determination of, or methodology employed, to isolate the discounted apportioned profits attributable to the alleged infringement. Instead, IBM, ***first,*** seeks to exclude the entirety of Mr. LaMotta's Income Approach—including analyses that IBM does not challenge—based on the

---

[1] Dr. Cole has testified before this Court. He has a Ph.D. in Network Security and over 25 years of experience in computer security.  IBM does not challenge Dr. Cole's qualifications as an expert.

[2] Mr. LaMotta has a BBA and MBA from Baylor University in Waco and is a Certified Licensing Professional—a professional designation earned by those who have demonstrated experience, proficiency, and knowledge regarding licensing and monetization of intellectual property. Mr. LaMotta has more than 12 years of experience in the assessment of economic damages, intellectual property valuation, and the evaluation of reasonable royalties. IBM does not challenge Mr. LaMotta's qualifications as an expert.

**PUBLIC VERSION**

allegation that Mr. LaMotta either failed to split those unchallenged apportioned profits between IBM and SunStone, or that he did so via a "black box."

Initially, the argument that Mr. LaMotta has not conducted a profit split is nonsensical. IBM acknowledges—and does not challenge—that Mr. LaMotta opined that apportioned profits amounted to ███████. But Mr. LaMotta did not opine that SunStone should receive the entire ███████████ as a reasonable royalty; instead, IBM concedes that Mr. LaMotta opined that only approximately ████████ of the apportioned profits should be awarded to SunStone as a reasonable royalty. In other words, *Mr. LaMotta split the apportioned profits*, as explained in both his report and deposition Indeed, LaMotta testified "my analysis of the GP factors and how that impacts the bargaining power tells me that SunStone should have ████████████ of the apportioned profits. I talk about that in GP 15, so this is just barely ████████████."[3]

IBM's apparent complaint is that he stated that opinion in dollar amounts, and not percentages—which is simply not a basis to exclude an expert opinion.

Moreover, Mr. LaMotta did not reach that result via a "black box." Mr. LaMotta's opinion is based on a careful review of the record, including IBM's own documents, witness testimony, and technical analyses, and analysis of the *Georgia-Pacific* factors and relative bargaining power of the parties, as was expressly described in his report and about which he extensively testified.

**Second**, IBM seeks to exclude Mr. LaMotta's opinions regarding ████████████ between SunStone and a third party, reductively describing those ██████████ as an ████████████ ████" But those ██████████s were, in fact, bilateral. Moreover, Mr. LaMotta did not blindly rely on those ██████████ as informative of value, but considered those ██████████ in the context of

---

[3] *See* Decl. of A. Pellegrino at ¶ 2 and Ex. 1, LaMotta Tr., 139:12-16.

other data points and the factual record to determine their relevance. IBM's criticisms thus go to the weight—not the admissibility—of those negotiations.

*Third*, IBM seeks to exclude references to separate litigation that inform the hypothetical negotiation analysis—including a jury verdict as to comparable technology and litigation filed by SunStone asserting the same patents at issue. But Mr. LaMotta sufficiently explains and considers the context of that litigation, and thus IBM's criticisms of those opinions go to their weight, not their admissibility.

Accordingly, Dr. Cole's and Mr. LaMotta's opinions meet the requirements of Rule 702 and *Daubert* and IBM's motion should be denied.

## II.   LEGAL STANDARD

The party offering the expert bears the burden of showing admissibility. *United States v. Hicks*, 389 F.3d 514, 525 (5th Cir. 2004). Federal Rule of Evidence 702 governs the admissibility of expert testimony, and provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)     the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)     the testimony is based on sufficient facts or data;
>
> (c)     the testimony is the product of reliable principles and methods; and
>
> (d)     the expert has reliably applied the principles and methods to the facts of the case.

FED. R. EVID. 702.

"When evaluating expert testimony, the overarching concern is generally whether the testimony is relevant and reliable." *Puga v. RCX Solutions, Inc.*, 922 F.3d 285, 293 (5th Cir. 2019) (citing *Daubert v. Merrell Dow Pharm., Inc.*, 509 U.S. 579, 589 (1993)). To be reliable, the

PUBLIC VERSION

testimony must be "grounded in the methods and procedures of science and . . . be more than unsupported speculation or subjective belief." *Id.* (citation omitted). To be relevant, the expert's reasoning or methodology must be properly applied to the facts in issue." *Id.* (cleaned up). When evaluating an expert under Rule 702, the Court's primary focus "should be on determining whether the expert's opinion will assist the trier of fact." *Id.* The "helpfulness threshold is low: it is principally . . . a matter of relevance." *Id.* at 294.

The Fifth Circuit has noted the limitations of the Court's role in evaluating experts under Rule 702:

> As a general rule, questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility. Particularly in a jury trial setting, the court's role under Rule 702 is not to weigh the expert testimony to the point of supplanting the jury's fact-finding role—the court's role is limited to ensuring that the evidence in dispute is at least sufficiently reliable and relevant to the issue so that it is appropriate for the jury's consideration. At no point should the trial court replace the "adversary system." As the Supreme Court explained, vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.

*Puga*, 922 F.3d at 294 (citing Daubert, 509 U.S. at 579). Consistent with those principles, "the rejection of expert testimony is the exception rather than the rule." *Id.* (quoting FED. R. EVID. 702, Adv. Comm. Notes (2000)).

## III.   ARGUMENT

### A.   Dr. Cole's Apportionment Methodology Is Properly Based On The Totality Of The Evidence

IBM seeks to exclude two paragraphs relating to technical apportionment out of Dr. Cole's technical expert report totaling 2674 paragraphs over 975 pages. IBM argues that certain of Dr. Cole's statements are "arbitrary" and "Plucked Out of Thin Air." (Mot. at 11). But, a review of the record shows Dr. Cole provided extensive support for his technical apportionment opinions.

**PUBLIC VERSION**

As evidenced by his expert report, Dr. Cole's technical apportionment opinion was "based on [his] experience and based on [his] review of the source code, documentation, and testimony of IBM's witnesses."  (Pellegrino Decl. at ¶ 3 and Ex. 2, Cole Report at ¶ 315). For example, Dr. Cole cites several documents to support his opinion, including the following:



**PUBLIC VERSION**



Like Dr. Cole, IBM's expert, Dr. Striegel, similarly provided an apportionment opinion using the various features and functions of the Accused Instrumentalities—though Dr. Striegel's technical apportionment percentage is more favorable to IBM than Dr. Cole's. As Dr. Striegel stated in his deposition:

Moreover, Dr. Cole further analyzed the apportionment attributable to the accused functionality in view of IBM's own witnesses, including IBM's corporate witnesses designated for the topic of IBM's acquisition of Trusteer (which developed the technology) and IBM's corporate witness designated for technical issues. (*Id.* at Ex. 2, Cole Report, ¶¶ 315-318).

In addition, contrary to IBM's assertion, Dr. Cole performed a quantitative analysis based on this information. When questioned by IBM's counsel during his deposition, Dr. Cole described his methodology to arrive at a "quantitative number":



**PUBLIC VERSION**



Dr. Cole further elaborated:

IBM's counsel went on to question Dr. Cole on several of the documents and deposition transcripts that Dr. Cole relied, and about Dr. Cole's extensive industry experience, to confirm Dr. Cole's methodology in arriving in his apportionment opinion. (*Id*. at 188:19-220:13.) Thus, like IBM's expert, Dr. Cole looked at the entirely of the record, including technical documentation from IBM, witness testimony, the features and functions of the accused instrumentalities, and the source code in determining the apportionment attributable to the accused functionality. *See Traxcell Techs., LLC v. AT&T Corp.*, No. 217CV00718RWSRSP, 2019 WL 4470618 (E.D. Tex. Sept. 18, 2019), *aff'd sub nom., Traxcell Techs., LLC v. Sprint Commc'ns Co. LP*, 15 F.4th 1121 (Fed. Cir. 2021).

Accordingly, Dr. Cole's opinions were based on a proper analysis of the accused technology. IBM's criticisms of Dr. Cole's apportionment opinions are directed at the differences between his opinion and IBM's expert's opinion and go to their weight, not their admissibility. *Puga*, 922 F.3d at 294. To the extent that IBM believes Dr. Cole's analysis has any flaws, IBM is free to address these issues during cross-examination. *Id*.

**PUBLIC VERSION**

### B.   Mr. LaMotta Properly Disclosed And Explained The Bases For His Profit Split Opinion

Despite conceding that Mr. LaMotta opined that apportioned profits amount to ███, but that only approximately ██████ of those apportioned profits should be awarded to SunStone as a reasonable royalty (Mot. at 14, n. 5), IBM ignores that express profit split, instead arguing that Mr. LaMotta failed to disclose a profit split opinion, or that any such opinion is based on an impermissible "black box." The crux of IBM's argument is that Mr. LaMotta did not disclose "any profit split *percentages* or *quantitative* analysis." (Mot. at 14) (emphasis added). Initially, Mr. LaMotta did perform—and incorporate into his profit share opinion—quantitative analyses.

Furthermore, what IBM argues is not what the law requires. Mr. LaMotta's report splits the (unchallenged) apportioned profits in dollars—not percentages—and describes the bases for that split, all of which are tied to the facts of the case and about which Mr. LaMotta testified at length. Accordingly, there is no basis to exclude Mr. LaMotta's Income Approach—particularly where IBM does not even challenge the majority of Mr. LaMotta's analysis within that approach.

### 1.   The Law Does Not Require What IBM Demands

It is indisputable that, after conducting quantitative and qualitative analyses pursuant to routinely-accepted methodologies, Mr. LaMotta opined that SunStone would only receive a portion of the apportioned profits as a royalty, but IBM demands more. IBM argues that it is not enough to have conducted those analyses, but that Mr. LaMotta was required to have explicitly performed a mathematical profit split within the Income Approach prior to considering the *Georgia-Pacific* factors, or that he express that profit sharing as a percentage. (Mot. at 14). That is not what the law requires.

The application of the *Georgia-Pacific* factors is an approved methodology for determining a reasonable royalty; "[t]hose factors properly tie the reasonable royalty to the facts of the

**PUBLIC VERSION**

hypothetical negotiation at issue." *LaserDynamics, Inc. v. Quanta Computer, Inc.*, 694 F.3d 51, 60 n.2 (Fed. Cir. 2012). Because the *Georgia-Pacific* analysis is qualitative, *PerdiemCo, LLC v. Industrack LLC*, No. 2:15-cv-727, 2016 WL 6611488, at *2 (E.D. Tex. Nov. 9, 2016), it does not lend itself to mathematical precision. Instead, the Federal Circuit has recognized that the reasonable royalty analysis "necessarily involves an element of approximation and uncertainty." *Lucent Techs., Inc. v. Gateway, Inc.*, 580 F.3d 1301, 1325 (Fed. Cir. 2009). Accordingly, even if an analysis is "not as quantitative" as the opposing party might like, "courts do not require an expert to provide a 'mathematical formula' in calculating a reasonable royalty rate." *Barry v. Medtronic, Inc.*, No. 14-cv-104, 2016 WL 7665423, at *3 (E.D. Tex. July 19, 2016).

Consistent with those well-established principles, the proper inquiry is not whether Mr. LaMotta expressed his profit split opinions mathematically or formulaically, but whether those opinions are based on a sound methodology and tied to the facts of the case. *See Summit 6, LLC v. Samsung Elecs. Co.*, 802 F.3d 1283, 1296 (Fed. Cir. 2015) ("[W]here the methodology is reasonable and its data or evidence are sufficiently tied to the facts of the case, the gatekeeping role [] is satisfied, and the inquiry on correctness of the methodology and [] results produced thereunder belongs to the [jury]."); *see also Realtime Data LLC v. EchoStar Corp.*, No. 17-cv-00084, 2018 WL 6266301, at *11 (E.D. Tex. Nov. 15, 2018) ("[A] damages model envisioning a hypothetical negotiation in which the parties bargain for respective shares of the economic benefit of a negotiation" is admissible when "the analysis is grounded in the specific facts of the case at hand."). Courts reject the kind of arguments made by IBM when an expert meets that standard. *See Barry*, 2016 WL 7665423, at *3 (rejecting "black box" argument where expert's opinions were tied to the facts of the case and holding that the "failure to precisely quantify the contribution of each [*Georgia-Pacific*] factor is by itself no basis to exclude expert testimony); *Comcast IP*

PUBLIC VERSION

*Holdings I, LLC v. Sprint Commnc'ns*, No. 12-cv-0205, 2015 WL 4730899, at *7 (D. Del. Aug. 10, 2015) ("Defendants are correct that [plaintiff's expert] did not offer a mathematical formula for her result. . . . That does not mean that her opinion was not based on a sound methodology. The hypothetical negotiation to determine a reasonable royalty can involve some approximation. . . . The lack of a mathematical formula, where there is other analysis, cannot, alone be grounds for excluding [the expert's] methodology."); *Bio-Rad Labs., Inc. v. 10X Genomics, Inc.*, No. 15-152-RGA, 2018 WL 5729732, at *2 (D. Del. Nov. 2, 2018) (rejecting argument that expert's methodology was inappropriate "because [it] relies on qualitative, instead of quantitative, analyses" because that argument "conflicts with the general understanding that 'any reasonable royalty analysis necessarily involves an element of approximation of uncertainty.'"); *PerdiemCo*, 2016 WL 6611488, at *3 (denying motion to exclude because, "[w]hile it is true that [the expert] does not disclose how he weighs or combines these metrics to arrive at his final royalty, estimating a reasonable royalty and apportionment is never an exact science."); *Radio Sys. Corp. v. Lalor*, No. C10-828RSL, 2014 WL 4626298, at *4 (W.D. Wash. Sept. 12, 2014) (rejecting argument that the expert "failed to adequately state the basis of his opinion" because "there is no requirement under Rule 702 that a proffered expert make complicated mathematical calculations."); *Plastic Omnium Advanced Innovation and Research v. Donghee Am., Inc.*, 387 F. Supp. 3d 404, 414 (D. Del. 2018) (rejecting argument that royalty rate was "picked . . . out of thin air" when the expert did not explain "which numbers he multiplied or adjusted, and in which direction" because "mathematical precision is not required.").

As set forth below, Mr. LaMotta rigorously analyzed the facts of the case under well-accepted methodologies before ultimately opining on the portion of the unchallenged apportioned profits that should be awarded to SunStone. That Mr. LaMotta did not turn that dollar amount into

**PUBLIC VERSION**

a percentage—or that his analysis was apparently "not as quantitative" as IBM might like—does not justify exclusion. *Barry*, 2016 WL 7665423, at *3.

> **2. Mr. LaMotta Performed Express Quantitative And Qualitative Analyses To Reach His Profit Split Opinions, And Those Opinions Are Tied To The Facts Of The Case**

Mr. LaMotta performed a multi-step analysis to determine the portion of the apportioned profits that should be awarded to SunStone. Mr. LaMotta first analyzed the value of the incremental contributions of the patents-in-suit, or the footprint of the invention in the marketplace. (Pellegrino Decl. at ¶ 6 and Ex. 5, LaMotta Report, ¶ 63). He performed that quantitative analysis under the cost approach, market approach, and income approach, and used those approaches to determine a baseline range. (*Id.*). Mr. LaMotta's quantitative analyses of those approaches considered a number of data points, tied to the facts of the case, including:

- IBM's sales and profit margins of infringing products (*Id.* at ¶¶ 84, 125, 130, 133-134);

- ███████████████████████████████████████████
  ███████████████████████████████████████████
  ████████████████

- The Rule 30(b)(6) testimony of IBM's witnesses regarding IBM's licensing practices, the nature of the technology, and the value of the infringing technology (*Id.* at ¶¶ 97-98, 100-101, 103-105, 122, 129-130, 177);

- The Rule 30(b)(6) testimony of SunStone regarding the development of the patented technology (*Id.* at ¶¶ 169);

- The analyses of SunStone's technical expert, Dr. Cole (*Id.* at ¶¶ 173, 175);

- IBM's documents describing the value of, demand for, and forecasts relating to the infringing technology (*Id.* at ¶¶ 122, 130-133, 174);

- IBM's written discovery (*Id.* at ¶¶ 96, 124, 126);

- ███

- ███████████████████████████████████████████

**PUBLIC VERSION**

Notably, IBM has **not** challenged Mr. LaMotta's opinions regarding the appropriate baseline range.

Mr. LaMotta also conducted two quantitative apportionment analyses to isolate the portion of the profits attributable to the patented invention. (*See id.* at Sections 7.4-7.6). Those analyses likewise considered a number of data points, tied to the facts of the case, including:

- IBM's documents describing the nature of, value of, and demand for the infringing technology (*Id.* at ¶¶ 141-144, 146, 151, 154-157, 159);

- The Rule 30(b)(6) testimony of IBM's witnesses regarding the nature of, value of, and demand for the infringing technology (*Id.* at ¶¶ 142, 146-147, 150, 154, 164-165);

- The analyses of SunStone's technical expert, Dr. Cole (*Id.* at ¶¶ 141, 145-146, 149, 155-156, 158, 162); and

- IBM's written discovery (*Id.* at ¶¶ 148-149).

Applying those analyses, Mr. LaMotta isolated the portion of the profits from the accused products that are attributable to the patents-in-suit, and then discounted those apportioned profits in determining apportioned profits attributable to the patents-in-suit of approximately ███ (*Id.* at ¶ 237). IBM has not challenged any of those analyses or the methodology employed to isolate the ███ in discounted apportioned profits.

After performing those quantitative analyses, Mr. LaMotta performed a qualitative analysis pursuant to *Georgia-Pacific* in order to determine what portion of the unchallenged apportioned profits should be awarded to SunStone. (*See id.* at Section 8). As Mr. LaMotta explained, and in reliance on a white paper titled "Bargaining Power and Patent Damages,"

> The Georgia-Pacific factors, when analyzed through the lens of economics, can aid the finder of fact in determining the benefit that each party would have gained from a successful negotiation, as well as each party's relative need to reach an agreement. **Thus, the Georgia-Pacific factors can serve as a starting point for**

> **determining each party's bargaining power by determining each party's willingness to end the voluntary negotiation.**

(*Id.* at ¶ 179, n. 244) (emphasis on original). Mr. LaMotta thus analyzed each of the fifteen *Georgia-Pacific* factors in detail, finding that three factors favored an upward adjustment to the baseline while the rest were neutral.  As LaMotta testified, ███████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████████████████

████████████████████████████████████

Like his earlier opinions, and in addition to incorporating the data he relied on as part of his market, income, and cost approaches and apportionment analyses, Mr. LaMotta's analysis of the *Georgia-Pacific* factors was tied to the facts of the case, including:

- IBM's sales and of infringing products (*Id.* at ¶ 6 and Ex. 5, LaMotta Report at ¶¶ 203, 209);

- ████████████████████████████████████████████████ ████████████████████████████████████████████████ ██████████████████████

- The Rule 30(b)(6) testimony of IBM's witnesses regarding IBM's licensing practices, the nature of the technology, and the value of the infringing technology (*Id.* at ¶¶ 196, 209-210, 213, 218, 226-227, 234, 236);

- The Rule 30(b)(6) testimony of SunStone and an interview with the inventor regarding SunStone's licensing practices and value of the patented technology (*Id.* at ¶¶ 185-186, 209, 236);

- The analyses of SunStone's technical expert, Dr. Cole (*Id.* at ¶¶ 207-209, 219-220);

- IBM's documents describing the value of, demand for, and forecasts relating to the infringing technology (*Id.* at ¶¶ 196, 203, 204, 209-210, 213, 216-218, 226-227, 236); and

- The parties documents demonstrating the commercial relationship between the parties (*Id.* at ¶¶ 190-191).

**PUBLIC VERSION**

Based on those quantitative and qualitative analyses, Mr. LaMotta opined on the share of the unchallenged ███████ in apportioned profits that would be allocated to SunStone. As Mr. LaMotta explained:



███████████ Relying on the facts and analyses previously discussed, Mr. LaMotta provided tables summarizing the parties' mindsets during the hypothetical negotiation and his analysis of the *Georgia-Pacific* factors, after which he opined that ████████████████████

████████████████████████████████████████████

████████████ In addition to relying on the extensive quantitative and qualitative

**PUBLIC VERSION**

analyses performed throughout his report, Mr. LaMotta noted that the following facts impacted his

ultimate opinion:

- ████████████████████████████████████████
  ██████

- ████████████████████████████████████████
  ███████████████

- ██████████████████████████████████████

- ████████████████████████████████████████

- ████████████████████████

- ████████████████████████████████████████

- ██████████████████████████████

- █████████████████

- ██████████████████████████████████████

- ████████████████████████████████

- ████████████████████████████████████████
  █████████████

████████████████   Based on the foregoing facts, quantitative analyses, and qualitative analyses,

Mr. LaMotta concluded that SunStone should be awarded ████████████████████

unchallenged apportioned profits. (*Id.* at ¶ 245).  LaMotta opined that his ultimate royalty figure

████████████████████████████████████████

████████████████████████████████████████

████████████████████████████████████████

██████████████████████████████████

**PUBLIC VERSION**

This is hardly the kind of impermissible "black box" present in the cases IBM relies upon.[4] Mr. LaMotta's opinion was not cursory, nor untethered to the facts of the case. Instead, his analysis was exhaustive and conducted according to well-established methodologies based on the record evidence—about which IBM can certainly cross-examine Mr. LaMotta. Nonetheless, IBM takes issue with the fact that—while Mr. LaMotta awarded SunStone ██████████████ apportioned profits and explained in his report and deposition the many bases supporting that split—Mr. LaMotta did not reduce that award to percentages or reach that conclusion through some mathematical equation. But as set forth above, Mr. LaMotta was not required to do so. *See supra.* And when, during Mr. LaMotta's deposition, IBM attempted to reduce Mr. LaMotta's extensive analyses to the arguments it now presents, Mr. LaMotta repeatedly rebuffed those assertions and explained the bases of his opinions:



---

[4] *See, e.g.*, *Uniloc USA, Inc. v. Microsoft Corp.*, 632 F.3d 1292, 1313 (Fed. Cir. 2011) (rejecting the application of the "rule of thumb," which Mr. LaMotta has indisputably not applied to his analysis); *Virnetx, Inc. v. Cisco Sys. Inc.*, 767 F.3d 1308, 1334 (Fed. Cir. 2014) (rejecting the Nash Bargaining Solution, which Mr. LaMotta has indisputably not applied to this analysis); *Odyssey Wireless, Inc. v. Apple Inc.*, 2016 WL 7644790, at *11 (S.D, Cal. Sept. 14, 2016) (again addressing the rule of thumb and Nash Bargaining Solution); *Lawrence v. Raymond Corp.*, 2011 WL 3418324, at *7 (N.D. Ohio Aug. 4, 2011) (rejecting expert testimony where the expert claimed to have conducted tests, but did not produce the results of those tests, and the expert testified that he had done no analysis to understand those tests); *GPNE Corp v. Apple, Inc.*, 2014 WL 1494247, at *5 (N.D. Cal. Apr. 16, 2014) (expert opinions were a "black box" because the expert admitted "that there is no methodology other than his '30 years of experience.'").

**PUBLIC VERSION**



---

[5] While IBM takes issue with the fact that Mr. LaMotta's disclosed opinions did not reduce dollars to percentages, as IBM's counsel conceded, reaching those percentages is "basic math." (Pellegrino Decl., at ¶ 2 and Ex. 1, LaMotta Tr., 139:19) Mr. LaMotta's testimony about the "basic math" required to turn the disclosed dollars in his report into percentages does not justify exclusion of his opinions. *See Plastic Omnium*, 387 F. Supp. 3d at 415 (rejecting argument that numerical figures discussed during the expert's deposition were untimely disclosed because the expert was merely "expounding on figures and information he had already relied on and provided in his reports[.]"); *cf. Tubular Rollers, LLC v. Maximums Oilfield Prods., LLC*, No. 4:19-cv-03113, 2021 WL 5991744, at *2 (S.D. Tex. Dec. 16, 2021) (noting that experts are limited to "the confines of their report and those concepts or opinions that are obviously inherent in those reports.").

**PUBLIC VERSION**

██████████████████████████████████████
██████████████████████████████████████
██████████████████████████████████████
████████████████████████

███████████████████████████████████████████████

Because Mr. LaMotta plainly disclosed his profit split opinions—and because those opinions are explicitly grounded in the record—there is no basis to exclude his opinions under the Income Approach. IBM's motion should be denied.

C.   **IBM's Complaints Regarding The** ████████████████ **Go To The Weight, Not The Admissibility, Of Mr. LaMotta's Opinions**

IBM also seeks to exclude as unreliable Mr. LaMotta's opinions regarding ██████████ ████████████████████—which occurred contemporaneously with the hypothetical negotiation—or what it reductively describes as an "██████████."

But it is indisputable that "questions relating to the bases and sources of an expert's opinion affect the weight to be assigned that opinion rather than its admissibility." *Puga*, 922 F.3d at 294. While IBM attempts to reduce the ██████████ to an ████████████," even IBM's own motion acknowledges that those ████████ were ██████ (Mot. at 21-22 ████████████

████████████). IBM also complains that the ██████████ should be excluded because ████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ████ But Mr. LaMotta addressed both of these complaints.

*First*, when asked whether it would have been appropriate to consider ██████████████ ███████████████████████████████████████████ ███████████████████████████████████████████ ███████████████████████████████████████████

18

**PUBLIC VERSION**

███████████████████████████████████████████████

███████████████████████████████████████████████

██████████████████████████████████████████

*Second*, Mr. LaMotta's opinion considered the impact of ████████ ████████ ████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████████████████████████

█████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

███████████████████ ███████████████

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████████████████████

████████████

Mr. LaMotta also conducted an interview of Sunstone's founder and the inventor of the

asserted technology, Dr. Ford, and learned that █████████████████████████████████

███████████████████████████████████████████████

████████ ████████████████████████████████████████

███████████████████████████████████████████████

████████. Accordingly, in the context of those considerations, Mr. LaMotta determined that the

**PUBLIC VERSION**

████████████████ were relevant to the hypothetical negotiation, including because of the following:

- ████████████████████████████████████
- ████████████████████████████████████
- ████████████████████████████████████████████████
- ████████████████████████████████████████████

████████████████████████████████████████

Furthermore, as Mr. LaMotta testified ████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████████

████████████████████████████████████████████████

Accordingly, Mr. LaMotta appropriately considered the context and necessary adjustments to the ████████████████, and any criticisms of his opinions go to their weight, not their admissibility. *Puga*, 922 F.3d at 294. If IBM believes the jury should not credit those ████████████, it can argue as much through "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof." *Id.*

**D.    IBM's Criticisms Of Mr. LaMotta's Reliance On Separate Litigation Go To Their Weight, Not Admissibility**

**1.   The Cisco Verdict**

IBM argues, as a bright-line rule, that a jury verdict cannot "represent evidence from which a hypothetical negotiation can be reliably determined," (Mot. at 20) and thus Mr. LaMotta's reliance on the Cisco verdict should be excluded. But IBM overstates the law.

As other courts have noted, contrary to IBM's argument, "[t]he Federal Circuit has not prohibited . . . reliance [on jury verdicts]." *Sprint Commn'ns Co.. L.P. v. Comcast Cable*, 225 F.

**PUBLIC VERSION**

Supp. 3d 1233, 1248 (D. Kan. 2016). To the contrary, the Federal Circuit "has ruled that a prior verdict may be relevant and admissible including with respect to a hypothetical license negotiation." *Id.*; *see also Sprint Commc'ns Co. v. Time Warner*, 760 F. App'x 977, 981 (Fed. Cir. 2019) ("Although [Defendant] argues that the introduction of evidence of a jury verdict is invariably improper, that is not the rule that this court has applied. Instead, the court has held that such evidence can be admissible if it is relevant for some legitimate purpose."). That is true even if the parties are different, so long as the verdict pertains to matter that is sufficiently comparable to the case at hand. *See Comcast*, 225 F. Supp. 3d at 1248 (collecting cases).

Here, Mr. LaMotta determined that the Cisco verdict was sufficiently comparable because of the following facts:



- The accused products in the Cisco litigation compete in the same field as the accused products in this case;

- ███████████████████████████████████████████████
  ████████████████

- The Cisco jury rendered its verdict six months prior to the hypothetical negotiation in this action.

(Pellegrino Decl. at ¶ 6 and Ex. 5, LaMotta Report, ¶¶ 111-114). Mr. LaMotta then considered the differences between the Cisco verdict and the accused technology, in conjunction with conversations with IBM's technical expert, Dr. Cole. Based on those differences, Mr. LaMotta adjusted the Cisco royalty. (*Id.* at ¶¶ 115-118). These are precisely the kind of circumstances under which courts have permitted reliance on jury verdicts. *See Cook Inc. v. Endologic, Inc.*, No. 1:09-cv-01248, 2012 WL 3948614, at *8 (S.D. Ind. Sept. 10, 2012) (denying motion to exclude expert's

reliance on jury verdict as a factor in her reasonable royalty analysis, even though the verdict involved separate parties, because it "involve[d] a competitor and similar . . . products" and was only one factor of many relied on by the expert); *Comcast*, 225 F. Supp. 3d at 1249 (permitting expert's reliance on jury verdict where the expert addressed the circumstances of the separate litigation and opined that the verdict was sufficiently comparable).

Accordingly, IBM's request to exclude Mr. LaMotta's reliance on the Cisco verdict should be denied.

### 2. The F5 Litigation

IBM also seeks to exclude Mr. LaMotta's reliance on litigation filed by SunStone against a third-party, F5, asserting infringement of the very same patents that are the subject of this lawsuit. The basis of IBM's argument is that (1) there has been no finding of infringement in the F5 litigation, and (2) SunStone's allegations in that lawsuit are "self-serving," and permitting reliance on separate litigation would create a "dangerous precedent," encouraging patent holders to "sue countless companies" as a "basis to boost their damages." (Mot. at 25-26). Neither of these arguments is well-founded.

First, that there has been no finding of infringement is irrelevant; Mr. LaMotta does not rely on the litigation to show infringement. Instead, he relies on the litigation as a single data point showing the use of the accused technology by market participants, which informs the *Georgia-Pacific* analysis. (Pellegrino Decl. at ¶ 6 and Ex. 5, LaMotta Report at ¶ 209-210). *Cf. Internet Machines LLC v. Alienware Corp.*, No. 6:10-cv-23, 2013 WL 4056282, at *14 (E.D. Tex. June 19, 2013) (permitting expert's reliance on disputed licenses where they were "clearly linked to the economic demand for the claimed technology.")

Second, IBM's aspersions regarding the "dangerous precedent" that could be set by permitting an expert to rely on litigation involving identical patents are nothing more than

**PUBLIC VERSION**

unfounded attorney advocacy. As the Court well knows, there are safeguards in place to prevent the filing of frivolous litigation. *See* FED. R. CIV. P. 11. IBM's arguments that SunStone's allegations against F5 are "self-serving" or a ploy to "boost" damages are completely unfounded and unsupported and should be rejected.

## IV.   CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny IBM's Motion in its entirety.

Dated: April 15, 2022                       Respectfully submitted,

                                            DICKINSON WRIGHT PLLC

                                    By:   */s/ Ariana D. Pellegrino*
                                            Christopher E. Hanba
                                            State Bar No. 24121391
                                            chanba@dickinson-wright.com
                                            Joshua G. Jones
                                            State Bar No. 24065517
                                            jjones@dickinson-wright.com
                                            DICKINSON WRIGHT PLLC
                                            607 W. 3rd Street, Suite 2500
                                            Austin, Texas 78701
                                            Telephone: (512) 770.4200
                                            Facsimile: (844) 670.6009

                                            Ariana D. Pellegrino
                                            State Bar No. P79104 (pro hac vice)
                                            APellegrino@dickinsonwright.com
                                            Zachary Pelton
                                            State Bar No. P85197 (pro hac vice)
                                            zpelton@dickinsonwright.com
                                            DICKINSON WRIGHT PLLC
                                            500 Woodward Avenue, Suite 4000
                                            Detroit, MI 48226
                                            Telephone: (313) 223-3684
                                            Facsimile: (844) 670-6009

23

**PUBLIC VERSION**

Caleb L. Green
State Bar No. 15234 (pro hac vice)
DICKINSON WRIGHT PLLC
3883 Howard Hughes Pkwy. Suite 800
Las Vegas, NV 89169
Telephone: (702) 550-4400
Facsimile: (844) 670-6009
cgreen@dickinsonwright.com

Kevin Sean Kudlac, Esq.
State Bar No. 00790089
kevin@kudlacip.com
KUDLAC PLLC
1916 Wimberly Lane
Austin, Texas 78735
Telephone: (512) 656-5743

*Attorneys for Plaintiff SunStone Information Defense, Inc.*

**PUBLIC VERSION**

**CERTIFICATE OF SERVICE**

I hereby certify that on April 15, 2022, I electronically served the foregoing document *via* electronic mail to all counsel of record.

*/s/ Ariana D. Pellegrino*
Ariana D. Pellegrino